COURT OF APPEALS OF VIRGINIA

Present:  Judges Baker, Coleman and Elder
Argued at Richmond, Virginia


VIRGINIA JOCKEY CLUB, INC.

v.         Record No. 1455-95-2          OPINION BY
                                      JUDGE SAM W. COLEMAN III
VIRGINIA RACING COMMISSION              APRIL 16, 1996

              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                     Randall G. Johnson, Judge


          Lawrence H. Framme, III, for appellant.

          Steven D. Gravely (Beverly W. Snukals; Mark B.
          Rhoads; Mezzullo & McCandlish, on brief), for
          appellee.


     Virginia Jockey Club, Inc. (appellant) appeals the trial

court's order affirming the Virginia Racing Commission's decision

awarding licenses to Colonial Downs, L.P. to own a horse

racetrack with pari-mutuel wagering, and to Stansley Racing

Corporation to operate such a track.  Appellant contends that the

trial court erred by holding that the commission did not exceed

its authority under the Virginia Pari-Mutuel Horse Racing Act

(Horse Racing Act) in awarding an owner's license to a limited

partnership, and an operator's license to a corporation that did

not file an application with the commission.  We hold that the

commission acted within the scope of its authority and affirm the

trial court's order.

     The General Assembly enacted the Horse Racing Act in 1988 to

allow horse racing with pari-mutuel betting in Virginia.  As part

of the legislation, the General Assembly created a racing commission and vested it with "control of all horse racing with pari-mutuel wagering in the Commonwealth, [and] with plenary power to prescribe regulations and conditions under which such racing and wagering shall be conducted, so as to maintain horse racing in the Commonwealth of the highest quality and free of any corrupt, incompetent, dishonest or unprincipled practices and to maintain in such racing complete honesty and integrity."  Code § 59.1-364(A).  The Act provides that "[n]o person shall construct, establish or own a horse racetrack or satellite facility where pari-mutuel wagering is permitted" without receiving an owner's license from the commission, and that "[n]o person shall operate pari-mutuel wagering or conduct any race meeting at which wagering is permitted" without first obtaining an operator's license from the commission.  Code § 59.1-375.

     Pursuant to its statutory authority, the commission established October 1, 1993, as the deadline for submitting applications for owner's and operator's licenses, prescribed the information to be provided in the applications, and permitted the filing of joint applications for owner's and operator's licenses.  See Code §§ 59.1-377, -381.  Six applicants, Virginia Racing Associates, L.P.; Virginians, Inc.; Churchill Downs, L.P.; Old Dominion Jockey Club, Inc.; Virginia Jockey Club, Inc.; and Stansley Management, L.P. submitted applications by October 1, 1993.  All six applicants submitted joint applications.

- 2 -

Stansley Management, L.P. (Stansley, L.P.) stated in its joint application that it would enter into a contract for the management of the racing facility with an entity controlled by Arnold Stansley. Arnold Stansley was Stansley, L.P.'s general partner, and was also a limited partner along with James Leadbetter. Stansley owned seventy percent of Stansley, L.P., and Leadbetter owned thirty percent. In June 1994, Stansley, L.P. changed its name to Colonial Downs, L.P.[1] and substituted Stansley Management Corp. (Stansley Corp.) as its general partner in place of Arnold Stansley. Stansley Corp.'s only shareholders are Stansley (70%) and Leadbetter (30%).

In May 1994, Colonial Downs informed the commission by letter that it would enter into a contract with Stansley Racing Corporation (Stansley Racing), a Virginia stock corporation to be formed, to operate and manage the racing facility if it received the owner's license. Stansley Racing was incorporated in June 1994, and its sole shareholders are Arnold Stansley (70%) and James Leadbetter (30%). Stansley and Leadbetter are also Stansley Racing's sole directors, and Arnold Stansley is the corporation's President.

As part of the application process, all six applicants provided financial data and analyses, engineering studies, architectural renderings, case studies, and demographic analyses

---

[1] Hereinafter, reference to Colonial Downs shall also include all references to Stansley, L.P.

in support of their different approaches for establishing a horse racing facility. The commission held several meetings and public hearings, and inspected each of the sites proposed by the six applicants. In addition, the commission received analyses of the applications from two expert consultants and afforded the applicants the opportunity to review those analyses and question the consultants' representatives. The commission also conducted background investigations of all persons having an ownership interest in the three corporations and three partnerships that applied for licenses.

In June 1994, the commission held an informal fact finding conference to receive sworn testimony and exhibits on the applications. At the conference, each applicant delivered an opening statement and rebuttal and was examined under oath by the commission and by other applicants. In addition, members of the public were permitted to comment on each application. A written six-volume transcript of the conference was prepared and is part of the administrative record.

After the conference, the commission permitted the applicants to file post-hearing submissions until June 23, 1994, and proposed findings of fact and conclusions of law until June 28, 1994. Because the applicants and the public continued to file materials after the June deadlines, the commission reopened the record on September 14, 1994. The record was closed a second time on September 21, 1994.

In its case decision issued October 14, 1994, the commission found that Colonial Downs' proposal to construct a racetrack in New Kent County was superior to the other five proposals and awarded Colonial Downs an owner's license and Stansley Racing an operator's license. The commission expressly found that Colonial Downs and Stansley Racing possessed the best overall financial plan and a proven management team, and that the Colonial Downs facility could be developed more quickly than the other proposed facilities and offered "the best site for a racetrack in Virginia." Furthermore, the commission found that Colonial Downs and Stansley Racing had satisfied all of the statutory and regulatory license criteria.

Appellant appealed the awards to the circuit court pursuant to Code § 59.1-373. The circuit court affirmed the commission's issuance of the licenses. The trial court held that Code § 59.1-378 does not limit the commission's authority to grant licenses to corporations only and that the commission did not act arbitrarily by awarding Stansley Racing an operator's license, even though it "did not technically apply" for a license.

I.

We first address the commission's contention that the Court of Appeals lacks jurisdiction over this appeal. Code § 17-116.05(1) expressly provides that the Court of Appeals shall have jurisdiction to review "[a]ny final decision of a circuit court on appeal from a decision of an administrative agency."

However, the commission argues that the provisions of Code § 59.1-373 control jurisdiction in this case rather than the general jurisdiction statute, and that by enacting Code § 59.1-373, the legislature intended that appeals from the commission would be by petition to the Supreme Court.

> Code § 59.1-373 provides:
> Any person aggrieved by a refusal of the Commission to issue any license or permit, the suspension or revocation of a license or permit, the imposition of a fine, or any other action of the Commission, may, within thirty days of such action, appeal to the Circuit Court of the City of Richmond. If the court finds that the action of the Commission was arbitrary, it shall order such action as it deems appropriate. The decision of the court shall be subject to appeal <u>as in other cases at law</u>.

(Emphasis added). The commission contends that the General Assembly made its intent clear by using the language "as in other cases at law" because appeals of actions at law generally lie with the Supreme Court. Code § 8.01-670(A)(3).[2]

In <u>Commonwealth v. E.W. Yeatts, Inc.</u>, 233 Va. 17, 353 S.E.2d 717 (1987), the Supreme Court held that the Court of Appeals has jurisdiction over a "civil action" instituted pursuant to Code § 33.1-387[3] because the right to file the action is dependent

_____

[2]Our decision concerning jurisdiction will determine whether appeals from the circuit court's review of the racing commission's decisions are entitled to be reviewed as a matter of right by the Court of Appeals, Code § 17-116.05(1), or by discretionary petition for appeal to the Supreme Court. Code § 8.01-670(A)(3).

[3]Code § 33.1-387 authorizes a contractor who has a claim against the Virginia Department of Transportation to file a civil

- 6 -

upon compliance with the administrative procedures set forth in Code § 33.1–386.[4]  Id. at 24, 353 S.E.2d at 721.  The Court reasoned that "[d]ivining legislative intent . . . is not a contest of labels but an exercise in common sense interpretation of statutory language."  Id.  Therefore, because the right to bring a civil action under Code § 33.1–387 arises in the context of an administrative action, the Court held that it is "a § 17–116.05(1) appeal."  Id.

The rationale in Yeatts is controlling here.  Use of the terms "civil action" or "other cases at law" in a statute does not, standing alone, define jurisdiction and divest this Court of its express jurisdiction.  Had the legislature intended to grant the Supreme Court jurisdiction over the circuit court's review of appeals from the racing commission, it would have expressly so provided.  As the Supreme Court instructed in Yeatts, such an

(..continued)
petition for such portion of a claim that the Commissioner administratively denies.  The statute provides:

> As to such portion of the claim as is denied by the Commonwealth Transportation Commissioner, the contractor may institute a civil action for such sum as he claims to be entitled to under the contract for himself or for his subcontractors or for persons furnishing materials for the contract by the filing of a petition in the Circuit Court of the City of Richmond or where the highway project which is the subject of the contract is located. . . .

[4]Code § 33.1–386 allows a contractor on a state highway construction project to file a claim with the Department of Transportation for amounts claimed to be owed on the contract.

indirect reference should not be construed to define jurisdiction or supercede the express mandate of Code § 17-116.05(1). Accordingly, we deny the commission's motion to transfer jurisdiction of this appeal to the Supreme Court.

## II.

### A.

Appellant contends that a partnership is ineligible to receive an owner's license under Code § 59.1-378. Appellant bases this contention upon language in Code § 59.1-378(C) to the effect that the commission shall deny a license to any applicant that is not a corporation which meets specified criteria. The appellant misconstrues the statute. The conditions apply only to applicants that are corporations and do not require that an applicant be a corporation in order to be eligible for an owner's license.

"[A] fundamental rule of statutory construction requires that courts view the entire body of legislation and the statutory scheme to determine the `true intention of each part.'" Virginia Real Estate Bd. v. Clay, 9 Va. App. 152, 157, 384 S.E.2d 622, 625 (1989) (quoting McDaniel v. Commonwealth, 199 Va. 287, 292, 99 S.E.2d 623, 627 (1957)), appeal dismissed, 398 S.E.2d 78 (1990); see also Moore v. Commonwealth, 155 Va. 1, 11, 155 S.E. 635, 638 (1930) (stating that "the legislative intention must be sought from the whole act, and not merely from certain parts of it").

Code § 59.1-377 expressly permits "any person," which under the Horse Racing Act includes a "natural person" or partnership, Code § 59.1-365, to apply for an owner's license. Furthermore, Code § 59.1-378(B) directs the commission to deny a license to an applicant if "the applicant, or any officer, <u>partner</u>, principal stockholder, or director of the applicant" has engaged in designated illegal conduct or undesirable practices. <u>Id.</u> (emphasis added). Appellant's selective emphasis on certain phrases in Code § 59.1-378(C) disregards the other statutory provisions, which clearly indicate that individuals, joint ventures, partnerships, associations, or corporations are eligible to receive an owner's license. <u>See</u> <u>Virginia Elec. & Power Co. v. Citizens for Safe Power</u>, 222 Va. 866, 869, 284 S.E.2d 613, 615 (1981) (stating that "a statute is not to be construed by singling out a particular phrase"). We hold, therefore, that Code § 59.1-378(C), read in the context of the Horse Racing Act, does not apply to all applicants, but only to corporate applicants. Thus, the trial court did not err in holding that Colonial Downs, operating as a limited partnership, was eligible to receive an owner's license.[5]

_____

[5]Appellant also contends that under Code § 59.1-382, the commission can only <u>award</u> operator's licenses to corporations. Because the commission awarded the operator's license to a corporation, a ruling on this issue would not affect the outcome of the controversy. "'The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or <u>to declare principles or rules of law which cannot affect the matter in issue in the case before it</u>.'" <u>Hankins v. Town of Virginia</u>

B.

Appellant next contends that the trial court erred by affirming the commission's decision to award an operator's license to the Stansley Racing Corporation. Appellant argues that because Stansley Racing was not formed until June 1994, it did not exist when applications were being submitted and its officers did not file an application for an operator's license on its behalf before the October 1, 1993 application deadline.

Code § 59.1-381(A) provides that "[a]ny person desiring to hold a race meeting or operate a satellite facility shall file with the Commission an application for an operator's license." Furthermore, Code § 59.1-382 provides that the commission shall . . . grant a valid operator's license to <u>applicants</u> who meet the criteria set forth in this chapter and established by the Commission." <u>Id.</u> (emphasis added). Appellant contends that this language is clear and unambiguous and that we cannot resort to general rules of statutory construction. <u>See</u> <u>Allstate Ins. Co. v. Eaton</u>, 248 Va. 426, 430, 448 S.E.2d 652, 655 (1994). Appellant argues that Stansley Racing did not exist on October 1, 1993, and did not apply for an operator's license. Therefore, Stansley Racing was not an "applicant," and the commission exceeded its statutory authority by awarding Stansley Racing an operator's license.

(..continued)
<u>Beach</u>, 182 Va. 642, 644, 29 S.E.2d 831, 832 (1944) (quoting <u>Mills v. Green</u>, 159 U.S. 651, 653 (1895)) (emphasis added).

- 10 -

Colonial Downs, a limited partnership, had filed a joint application for licenses to own and operate a racetrack and provided all of the required personal and financial information concerning the partnership and the limited and general partners. Several months after filing the application, Arnold Stansley and James Leadbetter, the sole partners of Colonial Downs, formed a corporation, Stansley Racing. The partners informed the commission that this corporation, of which they were the sole stockholders, officers, and directors, would operate and manage the racetrack if Colonial Downs was awarded the owner's license. As the trial court noted in holding that Stansley Racing was eligible to receive an operator's license, "[t]he same people who owned [Colonial Downs] now own Stansley Racing Corp., and they own it in the same percentages." Therefore, the question raised on these facts is not simply, as appellant suggests, whether the commission can award a license to an entity that does not apply. Clearly, an application must be filed before the commission may award a license. The critical issue before the commission, which is the dispositive issue on appeal, is the extent to which the commission possesses the inherent authority to discharge its responsibility under the Act by allowing an applicant to change its legal or organizational structure, or its ownership interests, and to amend its application or supplement its disclosure documents to reflect changes brought about by ongoing, legitimate business decisions and financial transactions.

Whether an administrative agency has acted within the scope of its authority is a question of law. Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). "Where the agency has the statutory authorization to make the kind of decision it did and it did so within the statutory limits of its discretion and with the intent of the statute in mind, it has not committed an error of law . . . ." Id. However, as appellant contends, when the question is whether the agency has "failed to comply with statutory authority . . . less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination." Id. at 243, 369 S.E.2d at 7-8.

Although the commission derives its powers from the Horse Racing Act, "[t]he statutory grant of power is not strictly limited . . . to the narrow confines of the express language of the statute. `[E]very power expressly granted, or fairly implied from the language used, or which is necessary to enable [the commission] to exercise the powers expressly granted, should and must be accorded.'" Muse v. Alcoholic Beverage Control Bd., 9 Va. App. 74, 78, 384 S.E.2d 110, 112 (1989) (quoting Portsmouth v. Virginia Ry. & Power Co., 141 Va. 54, 61, 126 S.E. 362, 364 (1925)); see also Fairfax County v. Miller & Smith, Inc., 222 Va. 230, 237, 279 S.E.2d 158, 162 (1981).

Code § 59.1-382 neither expressly grants nor denies the commission the authority to allow an applicant to amend its

application or to supplement its disclosure document.  The Horse Racing Act does not contain a definition of "applicant."  In arguing that an applicant should not be permitted to amend its application, particularly by substituting a newly formed corporation for a partnership, the appellant urges this Court to adopt the narrow definition of "applicant" that the legislature has used in other instances.  See, e.g., Code § 3.1-126.2:1 ("'Applicant' means the person who applies for, or requests, a license, or applies for registration of any liming material; or applies to become a contractor"); Code § 10.1-1400 ("'Applicant' means any and all persons seeking or holding a permit required under this chapter"); Code § 59.1-78 ("'Applicant' means a person filing an application for registration of trademark, case mark or service mark under this chapter, and includes his legal representatives, successors and assigns").  However, because the Act does not expressly address the administrative agency's authority to allow amendments, substitutions, or supplements to applications or disclosures, or the nature or extent of such modification, we look to "[t]he `basic law' under which the Commission acted and the purposes thereof" in order to determine whether the commission exceeded its statutory authority by granting Stansley Racing an operator's license.  Virginia Alcoholic Beverage Control Comm'n v. York St. Inn, Inc., 220 Va. 310, 313, 257 S.E.2d 851, 853 (1979) (footnote omitted).  "Those purposes must be gleaned from an analysis of the overall

- 13 -

statutory and regulatory scheme for the [licensing of racetracks]."  Id. at 313-14, 257 S.E.2d at 853.

The Code provisions that govern the licensing of owners and operators of horse racing tracks with pari-mutuel betting address two primary public policy concerns.  First, the legislation emphasized protecting the honesty and integrity of horse racing in the Commonwealth.  See Code §§ 59.1-364(A), -378(B), -379, -382(5).  Applicants for both owner's and operator's licenses must  provide the name and address of each individual who has an ownership interest or other pecuniary interest, Code § 59.1-377(A)(2), and are required to disclose "[s]uch information as the Commission deems appropriate regarding the character, background and responsibility of the applicant and the members, partners, stockholders, officers and directors of the applicant."  Code § 59.1-377(A)(3).  Furthermore, the commission must deny a license to an applicant if the applicant or one of its owners has failed to disclose any information requested, or has engaged in certain dishonest, fraudulent, unethical, illegal, or questionable practices or behavior.  See Code §§ 59.1-378(B), -379; see also Code § 59.1-382(5) (providing that "[t]he Commission shall deny a license to any applicant, unless it finds . . . [t]hat the applicant has made provisions satisfactory to the Commission for the detection and prosecution of any illegal, corrupt or fraudulent act, practice or conduct in connection with any race meeting or pari-mutuel wagering").

Second, the legislation is designed to ensure that horse racing is conducted on a sound financial basis, according to accepted business and management practices, in order to promote the success and growth of the horse racing industry in the Commonwealth. See Code § 59.1-364(A) ("Horse racing with pari-mutuel wagering as licensed herein shall be permitted in the Commonwealth for the promotion, sustenance and growth of a native industry, in a manner consistent with the health, safety and welfare of the people"). Under Code § 59.1-377, the application must provide information pertaining to the financial responsibility of all applicants or persons with a financial interest in the operation, the terms of leases or financing agreements, and detailed information about all stockholders, officers, and directors of a corporate owner, or each individual or partner of a partnership or joint venture. The commission is further instructed to "deny a license to any applicant, unless it finds that the applicant's facilities are or will be appropriate for the finest quality of racing, and meet or will meet the minimum standards that any track provided for standard breed racing be at least five-eighths of a mile, that any dirt track provided for flat racing be at least one mile, and that any track provided for flat or jump racing on the turf be at least seven-eighths of a mile." Code § 59.1-378(A). The commission is given broad discretion to "require such information about the enclosure and location of [the proposed] track as it deems

necessary and appropriate to determine whether they comply with the minimum standards provided in this chapter, and whether the conduct of a race meeting or pari-mutuel wagering at such location would be in the best interests of the people of the Commonwealth."  Code § 59.1-377(A)(4).

The application procedure is intended to ensure that the commission obtains and possesses all information necessary and desirable in order for it to render decisions that will promote "honesty and integrity" and the "growth of a native industry." Code § 59.1-364(A).  Clearly the legislature did not intend to unduly restrict the racing commission's ability to authorize applicants to pursue sound business or financial practices.  The General Assembly granted the commission broad power and discretion to prescribe the information required in the application process and to evaluate the applications.  Inherent in this broad grant of authority is the power to approve or require any amendments, substitutions, or supplements that sound business practices may dictate.

As the trial court noted, the commission "had all of the facts before it necessary to render its decision."  Stansley Racing provided the commission with copies of its articles of incorporation and bylaws.  From these documents, as well as the other information provided, the commission was able to determine that Arnold Stansley and James Leadbetter were Stansley Racing Corporation's sole stockholders and directors and that Stansley

Racing was in compliance with Code § 59.1-382.  The partners in Colonial Downs were the same persons who were the sole stockholders, officers, and directors of Stansley Racing. Furthermore, the formation of Stansley Racing did not affect or alter the substance of Colonial Downs' application with respect to the location, design, financing, and plan of operation for the proposed racetrack.  The substitution of Stansley Racing for Colonial Downs did not require the commission to investigate additional parties or evaluate a proposal different from that which Colonial Downs offered.  For these reasons, the commission's decision to award a license to Stansley Racing without requiring it to file a separate application did not exceed the commission's statutory authority.

If we adopted appellant's narrow definition of the commission's authority, we would frustrate the commission's ability to award licenses in a manner that would be "in the best interests of the people of the Commonwealth."  The commission might determine that an individual applicant's racetrack proposal was far superior to all other proposals, but that the interests of horse racing in Virginia would be better served if the applicant was a corporation that would have an ongoing existence as opposed to an individual or partnership.  These considerations would fall within the commission's expertise and discretion.

Nonetheless, under appellant's interpretation of the commission's statutory authority, the commission would

essentially be limited to four options: it could request the individual applicant to incorporate and resubmit another application; it could award the individual applicant the license despite its misgivings; it could reject a superior application for a less desirable one; or it could reject all applications and repeat the application process.[6] All of these options would hinder and unduly limit the commission in its ability to "promptly consider" the applications, Code § 59.1-382, and, most importantly, to work with, foster, oversee, and award licenses to applicants in a manner that will serve "the best interests of the people of the Commonwealth." Code § 59.1-377(A)(4). We hold, therefore, that the commission did not exceed its authority by awarding the license to a corporation when the stockholders, officers, and directors were the partners in the limited partnership that submitted the approved application. The ability of the commission to make business decisions of this nature "is necessary to enable [the commission] to exercise the powers

_____

[6]The facts of this case raise a similar scenario. Apparently, the formation of Stansley Racing was in response to concern that only corporations may qualify to obtain an operator's license under Code § 59.1-382(1). Although the proper interpretation of Code § 59.1-382 is not an issue before this Court, the statutory language reasonably interpreted suggests that only corporations are eligible to receive an operator's license. Therefore, the commission was faced with the possibility that three of the joint applicants were ineligible to receive an operator's license. Under appellant's interpretation of the commission's authority, the only options available to the commission were to begin the application process over again or award the license to one of the corporate applicants regardless of whether their proposals would best serve the interests of the people of the Commonwealth.

– 18 –

expressly granted."[7]  Muse, 9 Va. App. at 78, 384 S.E.2d at 112

(quoting Portsmouth v. Virginia Ry. & Power Co., 141 Va. at 61,

126 S.E. at 364 (1925)).

The commission's decision to treat Stansley Racing as an

applicant on the facts of this case was a matter reserved for its

expertise and discretion.  A contrary finding would not only

frustrate the Horse Racing Act's purposes, but would conflict

with the maxim "'that the [administrative agency] shall apply

expert discretion to the matters coming within its cognizance,

---

[7]Appellant also notes that the commission's instructions regarding the applications provide that "[a]mendments will be accepted until January 3, 1994."  However, it is clear from the commission's actions throughout the application process that the deadline applied to when applicants could amend their applications as a matter of right.  The deadline did not preclude the commission from allowing amendments or supplements to the application process which might be necessary or desirable for business reasons, provided the commission did not allow or prohibit amendments by the various applicants.  "[T]he interpretation which an administrative agency gives its regulation must be accorded great deference and will not be set aside unless arbitrary and capricious."  Virginia Real Estate Bd. v. Clay, 9 Va. App. 152, 159, 384 S.E.2d 622, 626 (1989).  The only indication in the instructions regarding the meaning of the term "amendments" is the statement that "[m]ergers and acquisitions of ownership interest by persons other than those listed in the application will be treated as an amendment to the application(s) affected by the merger or change in ownership." Because the commission had to investigate all persons with an ownership interest in the applicants, it had good reason to be more concerned with changes in ownership as opposed to changes that did not involve the addition of new parties.  Moreover, the commission gave all applicants the opportunity to make changes to their organizational structure after January 3, 1994.  Appellant, for instance, amended its articles of incorporation in April 1994 to provide for the repurchase of stock in accordance with Code § 59.1-378.  We hold, therefore, that the commission's interpretation and application of its instructions regarding the deadline for amendments was neither arbitrary nor capricious.

and judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion.'" York St. Inn, 220 Va. at 315, 257 S.E.2d at 855 (quoting Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405, 423, 88 A.2d 607, 615-16 (1952)); see Johnston-Willis, 6 Va. App. at 244, 369 S.E.2d at 8 ("[W]here the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts").

The commission did not exceed the scope of its statutory authority, and we affirm the trial court's decision.

Affirmed.

BAKER, J., concurring in part, dissenting in part.


I respectfully disagree with the majority's affirmation of the trial court's finding that an operator's license was legally granted to an entity that did not apply for such license within the time set by the Virginia Racing Commission (commission).

It is clear from this record that the commission set October 1, 1993 as the deadline for filing applications. Yet, it has granted an operator's license to a corporation that was not in existence when that deadline passed. That was not a mere "technical" error. For this reason, I would reverse the trial court's judgment and remand the matter with direction that the trial court enter an order revoking the operator's license granted to Stansley Racing Corporation by the commission.

I agree that this Court has jurisdiction to decide matters over which the commission has authority and that there is nothing in the statutes that created its authority which requires owners or operators to be corporate entities.